PORTO RICO TELEPHONE COMPANY, Plaintiff and Appellant, *v.* SOL LUIS DESCARTES, ETC., Defendant and Appellee.

No. 11034. Argued April 6, 1954.—Decided April 29, 1957.

846

Gonzalo Sifre and Horacio Franceschi for appellant. José Trías
Monge, Attorney General, and Edgar S. Belaval, Assistant
Attorney General, for appellee.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

Porto Rico Telephone Company, hereinafter referred to
as Rico Telco, is a corporation organized under the laws of
Delaware. It has an office in San Juan and is authorized to
do business in Puerto Rico where it is engaged in the opera-
tion of a telephone service as a public utility. International
Telephone and Telegraph Corporation, hereinafter referred to
as ITT, is a corporation organized under the laws of Mary-

land. It has an office in the city of New York and is the owner of 99.84% of the capital stock of Rico Telco. ITT has no office or place of business in Puerto Rico.

In 1940 Rico Telco declared and paid to its stockholders two dividends of $54,000 each. Rico Telco paid $53,829 of each of these dividends to ITT and $171 to various individual stockholders. During 1940–44 Rico Telco made certain payments of interest to ITT and to International Standard Electric Corporation, a wholly-owned subsidiary of ITT and hereinafter referred to as ISEC. The latter is a corporation organized under the laws of Delaware. It has no office or place of business in Puerto Rico.

In 1948 the then Treasurer notified Rico Telco of income tax deficiencies because the latter as withholding agent had not retained and paid a tax on the foregoing dividends and interest payments as income of the recipients from sources within Puerto Rico. Rico Telco has appealed from the judgment of the Superior Court affirming these deficiencies.[1]

---

[1] To enable it to appeal to this Court, Rico Telco paid the Treasurer the sum of $74,207.83, the total amount in controversy here. Of this amount, $26,997.43 was paid in connection with the 1940 dividends. The breakdown of this sum of $26,997.43 is as follows:

| | Dividends Paid by Rico Telco in 1940 | Deficiencies | 5% Penalty | 6% Interest to 12/26/52 | Total at issue |
|---|---|---|---|---|---|
| To ITT: | $107,658 | $15,475.84 | $773.79 | $10,706.69 | $26,956.32 |
| To others: | 342 | 23.60 | 1.18 | 16.33 | 41.11 |
| | $108,000 | $15,499.44 | $774.97 | $10,723.02 | $26,997.43 |

The remaining portion of the sum of $74,207.83—$29,963.70 in connection with interest paid to ITT and $17,246.70 resulting from interest paid to ISEC—is broken down as follows:

| | Interest Paid by Rico Telco to ITT | Deficiencies | 5% Penalty | 6% Interest to 12/26/52 | Total at issue |
|---|---|---|---|---|---|
| 1940 | $17,801.60 | $2,558.98 | $127.95 | $1,770.38 | $4,457.31 |
| 1941 | 12,460.03 | 2,096.02 | 104.80 | 1,324.33 | 3,525.15 |
| 1942 | 15,830.67 | 3,155.01 | 157.75 | 1,804.14 | 5,116.90 |
| 1943 | 16,278.52 | 3,506.02 | 175.30 | 1,794.50 | 5,475.82 |
| 1944 | 34,468.54 | 7,583.08 | 379.15 | 3,426.29 | 11,388.52 |
| | $96,839.36 | $18,899.11 | $944.95 | $10,119.64 | $29,963.70 |

# I

Two questions are presented by the problem of the dividends paid by Rico Telco in 1940. The first is whether any "substantive" provisions of our Income Tax Act imposed a tax on ITT for the dividends it received in 1940 from Rico Telco. If this question is answered in the affirmative, the second question arises: whether any "administrative" provisions of our Act required Rico Telco to withhold at the source from the dividends it paid to ITT in 1940 the tax thereon owed by ITT.

*First—Liability of ITT for tax herein.*

■■ Dividends are specifically listed as coming within the definition of "gross income" found in § 15(a) of the Act. Dividends to a nonresident from a foreign corporation are

| | Interest Paid by Rico Telco to ISEC | Deficiencies | 5% Penalty | 6% Interest to 12/26/52 | Total at issue |
|---|---|---|---|---|---|
| 1940......... | $4,326.71 | $621.96 | $31.10 | $430.29 | $1,083.35 |
| 1942......... | 7,394.17 | 1,478.83 | 73.94 | 845.64 | 2,398.41 |
| 1943......... | 24,642.03 | 5,350.85 | 267.54 | 2,738.74 | 8,357.13 |
| 1944......... | 16,367.34 | 3,600.81 | 180.04 | 1,626.96 | 5,407.81 |
| | $52,730.25 | $11,052.45 | $552.62 | $5,641.63 | $17,246.70 |

We thus see that on the following items Rico Telco was required to pay the Treasurer the following total sums for deficiencies, penalties, and interest:

| ITEM | TOTAL |
|---|---|
| Dividends paid by Rico Telco to ITT and others.............. | $26,997.43 |
| Interest paid by Rico Telco to ITT.......................... | $29,963.70 |
| Interest paid by Rico Telco to ISEC........................ | $17,246.70 |
| | $74,207.83 |

Taking the total amounts of the deficiencies, penalties, and interest for the above three items in the respective years, they read as follows:

| | Deficiencies | 5% Penalty | Interest | Total |
|---|---|---|---|---|
| 1940........... | $18,680.38 | $934.02 | $12,923.69 | $32,538.09 |
| 1941........... | 2,096.02 | 104.80 | 1,324.33 | 3,525.15 |
| 1942........... | 4,633.84 | 231.69 | 2,649.78 | 7,515.31 |
| 1943........... | 8,856.87 | 442.84 | 4,533.24 | 13,832.95 |
| 1944........... | 11,183.89 | 559.19 | 5,053.25 | 16,796.33 |
| | $45,451.00 | $2,272.54 | $26,484.29 | $74,207.83 |

treated under § 19 (a) 2 (B), as amended by § 3 of Act No. 18, Laws of Puerto Rico, Second Special Session, 1927, as gross income from sources within Puerto Rico, provided the foreign corporation derived at least 50% of its gross income during the previous three years from sources within Puerto Rico.[1a] Section 31 (b) provides that in the case of a foreign corporation ". . . gross income means only gross income from sources within Puerto Rico . . . in the manner provided in section 19."[2] Section 28, as amended by § 5 of Act No. 2, Laws of Puerto Rico, 1939, Special Session, provides for a net income tax of 14.375% on corporations.[3]

Rico Telco concedes (1) that it is a foreign corporation under the definitions set forth in § 2 (a) (4) and (5) of the Act, and (2) that it derived more than 50% of its income from sources within Puerto Rico during the three-year statutory period, as required by § 19 (a) (2) (B). Under these circumstances—in view of the provision in § 31 (b) that the

---

[1a] Section 19 (a) (2) (B), as amended by § 3 of Act No. 18 of June 3, 1927, reads in part as follows:

"Section 19.—(a) In the case of a nonresident individual not a citizen of Puerto Rico the following items of gross income shall be treated as income from sources within Puerto Rico:

". . . . . . . .

. "(2) The amounts received as partnership profits or dividends . . . (B) from a foreign corporation, except when less than fifty (50) per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends . . . was derived from sources within Puerto Rico, as determined under the provisions of this section."

[2] Section 31—13 L.P.R.A. § 735—defines the gross income of corporations as follows:

"(a) In the case of a corporation . . . subject to the tax imposed by section 28 the term 'gross income' means the gross income as defined in sections 15 and 19 . . .

"(b) In the case of a foreign corporation, gross income means only gross income from sources within Puerto Rico, determined . . . in the manner provided in section 19." (Italics ours.)

[3] Section 28, as amended by § 5 of Act No. 2 of 1939, provides as follows:

"There shall be levied, collected, and paid for each taxable year on the net income of every corporation or partnership a tax of 14.375 per cent on the net income in excess of the credits provided for in Section 34."

gross income of a foreign corporation from sources within Puerto Rico shall be determined in the manner provided in § 19—it would seem clear without further ado that ITT, a foreign corporation, was required under § 28 to pay in 1940 a 14.375% tax on the income it received attributable to Puerto Rico, including the dividends it received in 1940 from Rico Telco, less any credits or deductions provided in the Act.[4]

The first argument of the appellant contrary to this conclusion, as we understand it, is in substance as follows: The phrase in § 31(a) which we have italicized in transcribing § 31(a) in footnote 2—"subject to the tax imposed by section 28"—must also be read into § 31(b). Unless § 31(b) is so read, the Legislature would be attempting to tax corporations all over the world which have no relation to Puerto Rico. Furthermore, if § 31(b) does not include this phrase, foreign corporations would be subject to no tax whatsoever as they are not taxed under any section other than § 28. Consequently—reading § 31(b) as including the phrase "subject to the tax imposed by section 28"—we must then determine what foreign corporations are subject to the tax imposed by § 28. As of 1940 the only foreign corporations which the Legislature intended to tax were those foreign corporations, such as Rico Telco, having an office and doing business in Puerto Rico.

We cannot agree with this argument. Admittedly, § 28 is couched in language which seems to indicate that a tax as such is thereby imposed. But the primary purpose of § 28 is to fix the rate of the corporate and partnership tax. This is clear not only from the plain language of § 28 but also from its legislative history: the only substantial changes made by the Legislature in § 28 through the years have been

---

[4] We discuss hereinafter (1) the duty of ITT to make a return in which it might claim deductions for such dividends under § 32(a)(6)(B); (2) the retroactive elimination as of January 1, 1940 of such deductions as a matter of substantive law by Act No. 31 of 1941; and (3) the retroactive increase in 1941, effective January 1, 1940, of the rate of taxation of foreign corporations from 14.375% to 19% by the amendment of § 28 contained in Act No. 31 of 1941.

increases in the rate of taxation provided therein.[5] To determine what corporations are subject to the tax and what portions of their revenues constitute taxable income we must look elsewhere in the Act. Indeed, if this were not true, in the language of § 28 "every corporation" in the world would theoretically be subject to our income tax—a result which was obviously not intended by the Legislature.

Bearing in mind that § 28 primarily fixes the rate of taxation and that other sections of the Act—such as § § 15(a), 19(a)(2)(B), and 31(b)—determine which foreign corporations must pay the tax and what portion of their income is taxed, we see no point in the argument of Rico Telco that § 31(b) must be read as though it contained the phrase ". . . subject to the tax imposed by section 28 . . . ." Construing § 28 as establishing the rate of corporate taxation, we readily agree that it must be read together with both § § 31(a) and 31(b). In that sense, both § 31(a) and § 31(b) are "subject" to § 28; that is to say, the rate of taxation fixed in § 28 applies whenever gross income, as defined in § § 31(a) and 31(b), is taxed. And this is true despite the fact that the phrase ". . . subject to the tax imposed by section 28 . . ." is found in § 31(a) and is missing from § 31(b). In fact, this is so clear that if the said phrase had been omitted from § 31(a) as well as from § 31(b), we would have nevertheless read it into both § 31(a) and § 31(b)—or stated another way, together with—§ 28 in the sense we have construed § 28.

It should be added that even if we read § 31(b) as including the phrase ". . . subject to the tax imposed by section 28 . . .", we could not conclude therefrom that as of 1940 the

---

[5] Section 28 of Act No. 74, Laws of Puerto Rico, 1925; Section 5 of Act No. 2, Laws of Puerto Rico, 1939, Special Session; Section 14 of Act No. 31, Laws of Puerto Rico, 1941; Section 4 of Act No. 23, Laws of Puerto Rico, 1941, Special Session; Section 8 of Act No. 20, Laws of Puerto Rico, 1942, Second and Third Special Sessions; Section 1 of Act No. 88, Laws of Puerto Rico, 1945; Section 1 of Act No. 317, Laws of Puerto Rico, 1949, retroactive to July 1, 1945; 13 L.P.R.A. § 731.

Legislature intended to tax only foreign corporations having offices and doing business in Puerto Rico. There is nothing in § § 28, 31 or any other section of the Act which supports the appellant's position in this respect. Rather, as we have already indicated, § § 15 (a), 19 (a) (2) (B) and 31 (b), when read together, show unmistakably that foreign corporations receiving dividends which meet the 50%—three-year test of § 19 (a) (2) (B) must pay our income tax whether or not they have offices or do business in Puerto Rico.[6]

We find the other grounds which the appellant advances in support of its contention that in 1940 our Act did not impose a tax on the dividends it received from Rico Telco in 1940 equally untenable. However, we believe it more appropriate to discuss them in connection with the administrative provisions relating to withholding.[7]

Our conclusion is that ITT was required to pay taxes on the income it received attributable to Puerto Rico, including the dividends it received in 1940 from Rico Telco, less any credits or deductions provided in the Act. See footnote 4.

---

[6] Section 35 is primarily an administrative withholding provision, which we discuss in the *Second section* of this Part of the opinion. However, it is worth noting at this point that, in providing for the withholding of a tax of 14.375 percent on income from sources within Puerto Rico of foreign corporations which have no office and do no business here, § 35 supports our conclusion that the income of foreign corporations from sources within Puerto Rico—as defined in § § 15 (a), 19 (a) (2) (B), and 31 (b)—was subject to a tax thereon in 1940, despite the fact that such foreign corporations, as in the case of ITT, did no business in Puerto Rico and had no office here.

[7] These other grounds are (1) that § 32 (a) (6) (B)—providing for a deduction in favor of corporations for the dividends as there defined which the corporation receives—shows that only foreign corporations having an office or doing business in Puerto Rico were subject to our income tax in 1940; (2) that ITT was not subject to taxation under § 28 in 1940 because under § 32 (a) (6) (B) it could allegedly deduct the full amount of the dividends it received from Rico Telco in 1940, making its net income from Puerto Rican sources "nil"; and (3) that the Legislature did not intend to impose a tax on the dividends in question because it did not require in § 22 (a), as amended by Act No. 2 of 1939, withholding at the source of a tax on dividends paid to a foreign corporation not doing business in Puerto Rico.

*Second—Rico Telco was required to withhold at the source the tax on dividends it paid ITT in 1940.*

We note as a preliminary matter that this is a different question from the liability of ITT as a matter of substantive law for the tax involved herein. The withholding provisions of the Act do not impose taxes. Their sole purpose is administrative in that they provide for collection at the source through the withholding agent of taxes imposed on the ultimate recipient of the net income by other sections of the Act. And such withholding provisions are not given a retroactive effect in view of the fact that a withholding agent cannot be required to withhold from income which he has already distributed to the ultimate recipient. *Central Aguirre v. Tax Court*, 64 P.R.R. 257, 263–64.[8]

Rico Telco contends that there was no administrative provision in the Act during 1940 which required Rico Telco to withhold at the source and to pay on behalf of ITT a withholding tax on the dividends Rico Telco distributed to ITT in 1940. We cannot agree. On the contrary, under Section 22 (a), as amended by § 4 of Act No. 2, Laws of Puerto Rico, 1939, Special Session, one who paid a dividend during 1940 to a nonresident individual not a citizen of Puerto Rico was required to withhold therefrom ". . . the normal and additional . . ." tax fixed by the Act.[9] And § 35, as amended by § 6 of Act No. 2 of 1939, provided that "In the case of

---

[8] In a subsequent portion of this opinion we expressly overrule some phases of our holding in the *Aguirre* case. See footnotes 16 and 12. However, we adhere to that part of the opinion at pp. 263–4 in which we decide that the withholding provisions of our Act do not have a retroactive effect. On the other hand, as hereafter noted, we leave open the question of the effect of § 1 of Act No. 54 of 1945 on Rico Telco as a withholding agent, see footnote 21.

[9] Section 22 (a), as amended by § 4 of Act No. 2 of 1939, read as follows:

"All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of The People of Puerto Rico having the control, receipt, custody, disposal, or payment of interest, rent, salaries, wages, commissions, premiums, annuities, compensations, remunera-

foreign corporations . . . not engaged in . . . business within Puerto Rico and not having any office . . . therein, there shall be deducted and withheld at the source in the same manner and upon the same items of income, as is provided in Section 22, a tax of fourteen and three-eighths (14.375) per cent thereof, and such tax shall be returned and paid in the same manner and subject to the same conditions as provided in that section." We thus see that during 1940, by virtue of § § 22 (a) and 35 as they read at that time, in the case of foreign corporations taxes were required to be withheld at the same rate—14.375%—as such corporations were taxed under § 28 of the Act as it read in 1940.[10]

Prior to 1939 there was no specific mention of dividends in § 22 (a). See § 6 of Act No. 102, Laws of Puerto Rico,

---

tions, emoluments, or other gains, *dividends*, participation in partnership profits, and *other* fixed or determinable annual or periodical profits or income, of any nonresident individual not a citizen of Puerto Rico, shall (except as otherwise provided in regulations prescribed by the Treasurer under Section 19) deduct and withhold from *such* annual or periodical *gains, profits or income,* the normal and additional tax fixed by this Act; . . .". (Italics ours.)

[10] Section 14 of Act No. 31, Laws of Puerto Rico, 1941, amended § 28, retroactive to January 1, 1940, by increasing the tax on foreign corporations from 14.375% to 19%. As a matter of substantive law, this retroactive increase of the tax due from ITT on the income ITT received as dividends from Rico Telco in 1940 and 1941 was valid. *Ballester* v. *Court of Tax Appeals,* 61 P.R.R. 460, 484–88, affirmed in *Ballester-Ripoll* v. *Court of Tax Appeals,* 142 F. 2d 11 (C. A. 1, 1944), cert. denied 323 U. S. 723; *Central Aguirre* v. *Tax Court, supra,* p. 262.

However, whether the retroactive increase for which ITT was liable as a matter of substantive law can be collected from Rico Telco as withholding agent presents a different problem. To coordinate with the amendment of § 28 increasing the rate of taxation, § 35—the administrative withholding provision—was also amended by § 17 of Act No. 31 of 1941 to provide for withholding at the source of 19% instead of 14.375%. But this withholding provision is applied prospectively, not retroactively, see footnote 8. Indeed, the Treasurer makes no contention to the contrary in this case: In 1948 the Treasurer notified Rico Telco of the deficiency on dividends paid by Rico Telco to ITT in 1940 and that portion of the dividends paid in 1941 prior to April 12, 1941 at the 14.375% rather than the 19% rate. Since no effort was made in this case to collect the difference between a 14.375% tax and a 19% tax on the said dividends, we make no comment on the effect of § 1 of Act No. 54 of 1945 on this portion of the deficiency, see footnote 21.

1936, amending § 22 (a). By § 4 of Act No. 2 of 1939 the Legislature deliberately inserted the word "dividends" in § 22 (a) at the point where we have italicized it in footnote 9. But Rico Telco nevertheless argues that the insertion of "dividends" at that place did not require withholding of a tax on dividends. Its thesis is that dividends are "in contra-distinction to" and "not synonymous with" *gains, profits or income* and that consequently the failure of § 4 of Act No. 2 of 1939 to include *dividends* in the latter phrase at the place italicized in footnote 9 shows that the Legislature intended that the tax be withheld from *gains, profits or income* but not from *dividends*.

We reject this as a tortuous and unwarranted construction of § 22 (a) as it read after being amended by § 4 of Act No. 2 of 1939. When the Legislature inserted the word "dividends" in § 22 (a) by § 4 of Act No. 2, it clearly intended to make dividends subject to the withholding provisions of § 22 (a). We find no basis for the appellant's contention that in the context of § 22 (a) "dividends" means something different than "income". Section 22 (a) begins by listing the items to which its withholding provisions apply. This list ends with the catch-all phrase ". . . and *other* fixed or de-terminable annual or periodical profits or income . . .". (Italics ours.) The use of the word "other" in the catch-all phrase shows that the Legislature considered the specifically listed items—including dividends—as "income" within the meaning of § 22 (a). In addition, § 22 (a) concludes by providing for withholding ". . . from *such* annual or periodical gains, profits or income . . .". (Italics ours.) Clearly, the word "such" covers both the specific list of items, which in-cludes dividends, as well as ". . . other fixed . . . income". It follows that under § 22 (*a*), as amended by § 4 of Act No. 2 of 1939, Rico Telco was required to withhold the tax from the dividends it paid to ITT during 1940.

■ The appellant argues that the Legislature used the Federal Act as a model and that under the latter prior to

1936 ". . . domestic corporations were not required to withhold and pay tax on dividends distributed to non-resident aliens." But, as appellant itself points out, dividends were expressly included in the withholding provisions of the Federal Act for nonresident aliens in 1936. 49 Stat. 1648–1756. It was therefore not surprising that Puerto Rico made an analogous change in § 22 (a) by virtue of § 4 of Act No. 2 of 1939. In any event, our statute, although originally modelled in 1925 on the 1924 Federal Act, has been amended in many respects since that date. And this Court must determine the meaning and effect of such amendments, including the amendment of § 22 (a) by § 4 of Act No. 2 of 1939. See *Iglesias Costas et al.* v. *Secretary of Finance*, 220 F. 2d 651 (C. A. 1, 1955).

■ The appellant also argues that § 22 (a), as amended by § 4 of Act No. 2 of 1939, does not apply here as "the dividends paid by Porto Rico Telephone Company are not 'dividends . . . of any non-resident', but dividends of a resident foreign corporation." But in referring to "dividends . . . of any nonresident . . ." § 22 (a) is obviously referring to the dividends of the recipient, not of the distributor. Here the recipient is ITT. And as already noted, § 35, as amended by § 6 of Act No. 2 of 1939, provides for withholding in the same manner as provided in § 22 for income from sources within Puerto Rico which is paid to a foreign corporation like ITT which has no office and does not engage in business in Puerto Rico.

■■ We turn at this point to the three arguments appellant makes which involve both the substantive provisions and the administrative withholding provisions of the Act. See footnote 7. The first of these arguments is that, according to Rico Telco, § 32 (a) (6) (B) of the Act and Article 276 of the Regulations support its view that only foreign corporations having an office or doing business in Puerto Rico were subject to our income tax in 1940. Section 32 (a) (6) (B), under the heading "Deductions Allowed Corporations and Partnerships", provided that, in computing their net income,

corporations may deduct dividends received from foreign corporations provided it was shown ". . . to the satisfaction of the Treasurer that more than 50 per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends . . . was derived from sources within Puerto Rico as determined under section 19 . . .". For our purposes, Article 276 is substantially to the same effect.

The appellant argues that if ITT had in fact been subject to taxation under § 28, it could have deducted the full amount of the dividends it received from Rico Telco; that its net income from Puerto Rican sources would have then been "nil"; that such an "absurd" result could not have been intended by the Legislature; and that the latter therefore could not have intended to require foreign corporations like ITT—which do not have offices or do business in Puerto Rico—to pay taxes on dividends received from sources within Puerto Rico.

We disagree. By virtue of § § 19(f), 37(a), 39(a) of the Act and Article 199 of the Regulations, ITT—a foreign corporation with income from sources within Puerto Rico— was required to make a return (37a) ". . . stating specifically the items of its *gross* income and the deductions and credits allowed by this title." (Italics ours.)[11] We recognize that,

---

[11] From 1925 when the Act was first passed until 1941 when Act No. 31, Laws of Puerto Rico, 1941, was approved, § 19(f) read as follows:

"A nonresident individual not a citizen of Puerto Rico shall receive the benefit of the deductions and credits allowed in this title only by filing or causing to be filed with the Treasurer a true and accurate return of his total income received from all sources in Puerto Rico, in the manner prescribed in this title, including therein all the information which the Treasurer may deem necessary for the calculation of such deductions and credits."

Section 11 of Act No. 31 of 1941 added to § 19(f) some *Provided* clauses of a substantive nature which are not pertinent here. See 13 L.P.R.A. § 698(f).

Section 37(a), 13 L.P.R.A. § 740, provided from the inception of the Act that "Every corporation or partnership subject to taxation under this title shall make a return, stating specifically the items of its gross income and the deductions and credits allowed by this title. . . . If any foreign corporation has no office or place of business in Puerto Rico, but has an

in making a return of its gross income and in calculating its net income in 1940, ITT might have been entitled under § 32(a) (6) (B) *as it read in 1940* to deduct the dividends it received from Rico Telco in 1940. *Cf.* footnotes 10, 14 and text preceding it, 15, 18. However, § 32 is the general section which sets forth the various deductions allowed corporations. We have already concluded in the *First* section of this Part of this opinion that in 1940 Rico Telco was required —pursuant to the administrative provision set forth in § 22(a) as it read in 1940—to withhold at the source as agent and to pay the Treasurer on behalf of ITT from the dividends Rico Telco paid to ITT in 1940 the amount of the tax levied on ITT by § 28 under the formula provided by §§ 15(a), 19(a) (2) (B), and 31(b). It was therefore not for Rico Telco as withholding agent to determine what deductions, if any, were available to ITT in 1940 under § 32 or any other section. This is not a case involving items of income wholly exempt from taxation. *Cf.* 10 Mertens, *Law of Federal Income Taxation*, § 56.32, pp. 149–50.[12] Rico Telco's only concern in the matter was to withhold and pay the tax as required by §§ 22(a) and 35. The proper way for *ITT* to claim deductions, including the deduction, if any,

---

agent in Puerto Rico, the return shall be made and sworn to by the agent. . . ."

Section 39(a), 13 L.P.R.A. § 741, likewise since the inception of the Act, has provided the following:

"Returns of corporations or partnerships shall be made at the same time as is provided in subdivision (*a*) of Section 27, except that in the case of foreign corporations not having any office or place of business in Puerto Rico returns shall be made at the same time as provided in section 27 in the case of a nonresident individual not a citizen of Puerto Rico."

Article 199 of the Regulations provides in part that "Unless a nonresident individual not a citizen of Puerto Rico, a foreign corporation, or a citizen of Puerto Rico or domestic corporation shall file or cause to be filed with the collector, a true and accurate return of income from sources within Puerto Rico, regardless of amount, the tax shall be collected on the basis of the gross income (not the net income) from sources within Puerto Rico."

[12] In the *Aguirre* case at p. 262 we treated the right to claim a deduction for dividends in effect as an exemption. This was erroneous.

860

provided in § 32 (a) (6) (B), would be in the return which *ITT* was in 1940 required to, but apparently did not, file. See footnote 11, particularly Article 199 of the Regulations.[13] Moreover, § 32 (a) (6) (B) was repealed by § 15 of Act No. 31, Laws of Puerto Rico, 1941, effective retroactively as of January 1, 1940; the result as a matter of substantive tax law was that ITT was validly deprived—retroactively as of January 1, 1940—of the right to any deduction under § 32 (a) (6) (B) for the dividends it received from Rico Telco in 1940. See footnote 10.[14]

The second of these two arguments—which is closely related to the first argument—is that ITT was not subject to taxation under § 28 in 1940 because it could allegedly deduct the full amount of the dividends it received from Rico Telco in 1940 under § 32 (a) (6) (B) as it read at the time, making its net income from Puerto Rican sources "nil". But the fact that one source of income to a foreign corporation may have been deductible under § 32 as it read in 1940 did not thereby exempt it from liability under other applicable sections at the rate provided in § 28. Indeed, the appellant could not have placed much credence in this contention: in 1940 Rico Telco withheld and paid to the Treasurer taxes owed by ITT on the management fees of $47,937.72 paid in that year by Rico Telco to ITT.[15]

---

[13] *Cf. Postley* v. *Secretary of the Treasury*, 75 P.R.R. 822, where the nonresident taxpayer in a suit for refund—not the withholding agent—successfully assailed discriminatory taxation under the privileges and immunities clause.

[14] Since the record contains no returns by ITT or Rico Telco or any indication of whether they operated on fiscal or calendar years, it is not clear whether the retroactive elimination of the right of ITT to deduct dividends it received in 1940 was enacted on a date—April 12, 1941—prior to the date by which under §§ 39 (a) and 27 (a) of the Act ITT was required to file its return for its 1940 income from sources within Puerto Rico. In any event, § 26 of Act No. 31 of 1941 required the filing of corrected return reflecting the retroactive tax liabilities resulting from Act No. 31.

[15] According to Exhibit A, in 1940 Rico Telco withheld and paid to the Treasurer $6,891.05 as taxes owed by ITT—at the rate of 14.375% then provided in § 28 on the management fees of $47,937.72 paid in that year by Rico Telco to ITT. However, the amended complaint alleges and the

■ Third and finally, the appellant contends that since the only effective way to collect taxes under the circumstances herein is through the withholding device under § 35, the Legislature could not have intended to impose a tax on the dividends in question because it did not require in § 22(a), as amended by § 4 of Act No. 2 of 1939, withholding at the source of a tax on dividends paid to a foreign corporation not doing business in Puerto Rico. The short answer to this argument, as we have already held, is that § 22(a) as amended in 1939 did in fact require withholding at the source of a tax on such dividends.

According to the appellant, ITT ". . . became, for the first time, a taxpayer with respect to dividends received from Puerto Rico, and Porto Rico Telephone Company became a withholding agent for that purpose . . .", by virtue of the amendment of § 22(a) by § 12 of Act No. 31 of 1941 whereby for the first time the word "dividends" was inserted in the latter portion of § 22(a) between "gains" and "profits" in the phrase "such annual or periodical gains, dividends, profits or income . . .". See footnote 9. Again we disagree. In the first place, § 22(a) plays no role on the question of the substantive liability of ITT for the tax herein; as we have seen, that substantive liability existed in 1939 under other sections of the Act. Secondly, even as to the administrative withholding provision, for reasons already stated, § 22(a), as amended by § 4 of Act No. 2 of 1939, already provided for withholding in the case of dividends; the insertion therein of the word "dividends" in the place indicated, although it removed any possible doubt on this question, was unnecessary. *Cf. Ballester* v. *Court of Tax Appeals, supra,* 476.

The appellant relies on *Central Aguirre* v. *Tax Court,*

Treasurer admits in his answer that $9,108.17—the tax thereon at 19%—has been withheld. Exhibit A indicates that "the deficiency" was paid on June 25, 1952. We have found no explanation in the record as to why the difference between $6,891.05 and $9,108.17 was paid on that date as a retroactive tax nor any indication that a corrected return was filed under § 26 of Act No. 31 of 1941, see footnote 14.

*supra.* In that case in 1940 the plaintiff, a domestic corporation, paid dividends to its principal stockholder, a Massachusetts trust known as Central Aguirre Associates which had no office or business in Puerto Rico. The gross income of the Associates that year consisted entirely of dividends from Puerto Rican corporations, including the dividends received from the plaintiff.

In the *Aguirre* case we held that the Legislature did not intend for the amendment of § 22 (a) by § 12 of Act No. 31 of 1941 to apply retroactively to 1940 income. But that question was in fact not involved in the *Aguirre* case. We discussed it because we were under the erroneous impression that during 1940 the applicable statute was § 22 (a), as amended by § 6 of Act No. 102, Laws of Puerto Rico, 1936. But, for the reasons already stated, § 22 (a), *as amended by § 4 of Act No. 2 of 1939*, required withholding from dividends paid in 1940. Consequently, no problem as to retroactive application of the withholding provision was really involved in the *Aguirre* case since the 1939 withholding provision, specifically covering dividends, was in effect throughout 1940. We adhere to the general proposition that the Legislature did not intend for the 1939 and 1941 withholding provisions to apply retroactively to income already paid by the withholding agent to the recipient. See footnote 8. But insofar as it holds that § 22 (a) as it read in 1940 did not require withholding as to dividends, the *Aguirre* case is expressly overruled.[16]

---

[16] In its brief the appellant argues that, in referring to Act No. 102 of 1936 at p. 260 of the *Aguirre* case, we made merely a "typographical or clerical" error and that we were really interpreting § 22 (a) as amended by § 4 of Act No. 2 of 1939 in that case. We disagree. Our summary of § 22 (a) at p. 260 of the *Aguirre* case significantly leaves out the word "dividends" which was not in the 1936 version of § 22 (a) but did appear for the first time in the 1939 version. Also, in the *Aguirre* case we gave great importance to the language of § 22 (a), *as it read in 1936,* by quoting it at p. 260 and italicizing the portion thereof which excepted from the withholding requirement dividends which were allowed as a credit under § 18 (a). But the exception in question was specifically eliminated from § 22 (a) by § 4 of Act No. 2 of 1939.

Moreover, unlike ITT in this case, the stockholder in the *Aguirre* case—the Associates—made a return on January 14, 1941 declaring its gross income from sources within Puerto Rico as required by § 37(a). *Central Aguirre Sug. Co.* v. *Treasurer, supra,* 353. And in this return the Associates claimed a deduction for the dividends under § 32(a) (6)(B) as it then read. The withholding agent made its return on March 14, 1941, but did not withhold any tax on the dividends it paid to the Associates. Under these circumstances, particularly in view of § 22(d) and Article 215 of

---

Section 22(a) as it read in 1936 excepted from its withholding requirements dividends received by *individuals* for which they were allowed a credit under § 18(a) as it read in 1940. We apparently assumed in the *Aguirre* case at pp. 260–61 that this provision of §22(a) creating an exception from its withholding requirements also applied to those dividends received by *foreign corporations* which the latter were entitled to deduct from their gross income under § 32(a)(6)(B) as it read in 1940. We apparently based our assumption on the provision in § 35 that the tax on the income of foreign corporations shall be withheld in the same manner as established in § 22(a) for individuals. *Cf.* § 211 of the Regulations which is set forth in footnote 19. We need not reexamine this problem in view of the elimination of the said exception from § 22(a) by § 4 of Act No. 2 of 1939.

We find nothing in *Próspero Fruit Co.* v. *Tax Court,* 64 P.R.R. 631, cited by the appellant, which indicates that in deciding the *Aguirre* case we relied on the 1939 rather than the 1936 version of § 22(a). The short of the matter is that in the *Aguirre* case we overlooked the applicable 1939 version of § 22(a) and mistakenly applied to a case involving a 1940 tax the 1936 version of § 22(a).

The Tax Court in its opinion in the *Aguirre* case cited Act No. 2 of 1939. *Central Aguirre Sugar Co.* v. *Treasurer,* 1 D.T.C. 348, 352–3. But instead of undertaking to determine the effect of Act No. 2 on § 22(a), the Tax Court relied on § 81(b) of the Act. *Central Aguirre Sugar Co.* v. *Treasurer, supra,* pp. 359–61. Neither party cited Act No. 2 in his brief in this court. Nor did the Treasurer move for reconsideration of our opinion and decision in the *Aguirre* case in which we overlooked Act No. 2 of 1939.

On the contrary, at p. 8 of his brief in this Court in the *Aguirre* case counsel for the Treasurer made the following incorrect admission: "It is true that at the time the petitioner paid the dividends to Central Aguirre Associates it was not required to withhold anything as the said dividends were not at that date subject to such a tax by the statute then in effect." The Treasurer relied on § 81(b) of the Act on which as we have seen the Tax Court likewise based its decision. We adhere to our view stated at p. 264 of the *Aguirre* case that § 81(b) is inapplicable.

the Regulations,[17] the withholding agent was in a better position than the appellant herein to argue that under § 22(a) —even as amended by § 4 of Act No. 2 of 1939—its action in not withholding did not prejudice the position of the Government since the return of the Associates showed in fact that no tax was due when both returns were made.[18] Here, as already noted, not only did Rico Telco fail to withhold as required by § 22(a) as amended by § 4 of Act No. 2 of 1939 but ITT made no return as required by § 37(a), see footnote 11.

[17] Section 22(d), reenacted as § 22(f) by § 6 of Act No. 102, Laws of Puerto Rico, 1936, reads as follows: "If any tax required under this section to be deducted and withheld is paid by the recipient of the income, it shall not be recollected from the withholding agent; nor in cases in which the tax is so paid shall any penalty be imposed upon or collected from the recipient of the income or the withholding agent for failure to return or pay the same, unless such failure was fraudulent and for the purpose of evading payment."

Article 215 of the Regulations reads as follows: "Returns of Income from which Tax Withheld—The entire amount of the income from which the tax was withheld shall be included in gross income without deduction for such payment of the tax. But any tax actually so withheld shall be credited against the total tax as computed in the taxpayer's return. See article 69. If the tax is paid by the recipient of the income or by the withholding agent it shall not be re-collected from the other, regardless of the original liability therefor, and in such event no penalty will be assorted against either person for failure to return or pay the tax where no fraud or purpose to evade payment is involved."

[18] We are not to be understood as indicating that in the *Aguirre* case both the domestic corporation and the Associates complied with the requirements of the Act as to returns. The domestic corporation, which had filed a return prior to approval of Act No. 31 of 1941, filed a corrected return on August 11, 1941, as required by § 26 of Act No. 31, see footnote 14; it paid no tax on the ground that as the withholding agent it was not liable therefor since the Associates had no net income subject to taxation under the Act as it read at the time the domestic corporation paid the dividends to the Associates. On the other hand, the Associates, although it made a return on January 14, 1941, apparently filed no corrected return, as required by § 26. Even if it had done so and had challenged the validity of (1) the retroactive elimination of the credits or deductions for dividends, (2) the retroactive increase of the rate of taxation, and (3) the higher rate of taxation for foreign as against domestic entities provided in Act No. 31 of 1941, it would not have prevailed. Cases cited in footnote 10; *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F. 2d 96 (C. A. 1, 1946).

Articles 211 and 212 of the Regulations,[19] on which the appellant relies, do not apply here in view of our holding that by virtue of a 1939 amendment the appellant was required to withhold the tax on dividends. Articles 211 and 212, which were promulgated in 1926,[20] have been superseded to the extent that they are in conflict with amendments to the Act. Consequently, we cannot agree with the appellant that the Government is estopped to assert the claim herein.

The result we have reached makes it unnecessary to decide what effect § 1 of Act No. 54, Laws of Puerto Rico, 1945, has on this case.[21] However, we note in passing that Act No. 54

[19] Article 211 reads as follows: "Withholding Tax at Source.—In general, withholding is required (a) of a tax of 6 per cent in the case of fixed or determinable annual or periodical income payable to a nonresident individual not a citizen of Puerto Rico or to a partnership not engaged in trade or business within Puerto Rico and not having any office or place of business therein, and composed in whole or in part of nonresident individuals not citizens of Puerto Rico, except (1) dividends of a class allowed as a credit by subdivision (a) of section 18; (b) of a tax of 12½ per cent in the case of fixed or determinable annual or periodical income (with the exceptions just stated) payable to a foreign corporation or partnership not engaged in trade or business within Puerto Rico and not having any office or place of business therein (section 35)."

Article 212 reads in part as follows: "Fixed or Determinable Annual or Periodical Income.—Only fixed or determinable annual or periodical income is subject to withholding. Among such income, giving an idea of the general character of income intended, the statute specifies interest, rent, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments. But other kinds of income may be included, as for instance, royalties."

[20] The Income Tax Regulations have been reprinted but, so far as we are aware, there has been no general revision thereof—or any changes in Articles 211 and 212—since the Regulations were originally approved in 1926.

[21] Section 1 of Act No. 54 reads in part as follows:

"If a withholding agent . . . may have failed or may fail to comply, in any year on and after January 1, 1940 . . . with any of the provisions of Section 22 or of Section 35 of the Income Tax Act (Act No. 74 of 1925), as subsequently amended, by failing to withhold at its source the taxable tax [sic] on income remitted by him or by it to nonresidents who are not citizens of Puerto Rico, or to corporations or partnerships not operating a business in Puerto Rico or not having any office in the Island, thus failing to pay the corresponding tax, he or it shall be obligated by this Act to comply with the provisions of Section 22 or of Section 35, as the case may be, withholding from the first

of 1945 seems to have been approved as the result of language in the *Aguirre* case, decided in 1944, to which we adhere. We said in that case at p. 265: "Even the very Act of 1941 does not contain any provision expressly authorizing the Treasurer of Puerto Rico to require from those corporations which have already paid dividends pertaining to 1940, that they withhold, out of any dividends which may have been declared subsequent to 1940, or which may be declared in the future, the [retroactive increase in the] amount of the tax imposed by the new Act upon the nonresident stockholders with respect to dividends received by them in the month of July, 1940. It is incumbent on the Legislature—not on the judicial tribunals—to grant such authorization to the Treasurer." (Matter in brackets ours.)

We also note that if Act No. 54 were interpreted to cover the instant case, it would not mean that a retroactive tax on 1940 income was being imposed in 1945—five years after the taxable event. Rather it would simply mean that a valid tax having been imposed in 1941 on 1940 income, the withholding agent was being required in 1945 to retain and pay to the Treasurer from future payments of income to the recipient the tax which as a substantive matter the latter owed but failed to pay in 1941.[22]

For the reasons stated, the Superior Court did not err in

payment of income that he or it may have to make, after the date of effectiveness of this Act, or from subsequent payments, should the first one not suffice, the amount of the unpaid tax, whenever said first payment or subsequent payments have to be made to the same individual or to the same corporation or partnership with respect to whom or to which the original retention of the tax was not made, as provided in Section 22 or in Section 35 of the said Income Tax Act."

[23] We also deem it appropriate to repeat our language in the *Aguirre* case at p. 265: "Whether the Treasurer of Puerto Rico may, under the laws now in force, subject or affect in any way the dividends which the Central Aguirre Sugar Company may now or hereafter hold or control for payment to Central Aguirre Associates, and whether said Treasury may, under our procedural laws, subject or bind to the payment of unsatisfied taxes the shares of stock held by Central Aguirre Associates in the Central Aguirre Sugar Company, are questions not involved in this proceeding and which we will therefore pass without expressing any opinion thereon."

holding that the Treasurer acted properly in notifying Rico Telco of deficiencies because of its failure to withhold taxes from the dividends it paid in 1940 to ITT and other stockholders.[23]

## II

 During 1940–44 Rico Telco made certain payments of interest to ITT and ISEC.[24] It contends that Puerto Rico was not "constitutionally empowered" to impose a tax on such interest paid by it to ITT and ISEC, foreign corporations not doing business in Puerto Rico, ". . . when the indebtedness on which such interest was paid was incurred outside Puerto Rico, and interest and principal were payable outside Puerto Rico, and where there were no concrete or tangible evidences of such indebtedness within Puerto Rico, such as bonds or notes or bank deposits, requiring the sanction of the laws of Puerto Rico to permit their transfer."[25]

The appellant argues that Puerto Rico has "no jurisdiction to tax"[26] such interest and that its attempt to do so is

---

[23] The appellant concedes and we agree that the problem of withholding by Rico Telco of a tax of $41.11 on dividends of $342 paid by Rico Telco to its other stockholders in 1940, see footnote 1, is governed by similar considerations. We therefore need not examine that point in detail.

The question of penalties for failure to withhold the tax on the 1940 dividends is discussed in Part III of this opinion.

[24] The details of such payments are found in the second paragraph of footnote 1.

[25] We reject, for the same reasons given in the First Section of Part I of this opinion, appellant's argument that under § 31 of the Act Rico Telco was not required to withhold the tax on the interest involved herein. Once that contention is out of the way, it is clear that Rico Telco was required to withhold the tax on such interest under § § 15 and 19, provided there are no valid constitutional objections thereto.

We agree that Rico Telco has standing to contest the deficiencies in this case. *Valdés* v. *Secretary of the Treasury*, 78 P.R.R. 551, 558; *Harvester Co.* v. *Dept. of Taxation*, 322 U. S. 435, 440.

[26] The phrase "jurisdiction to tax" ". . . obscures rather than enlightens, for it only states a result and does not analyze the Constitutional problem." Mr. Justice Frankfurter, concurring in *State Tax Comm'n* v. *Aldrich*, 316 U. S. 174 at 183. To the same effect, *Wisconsin* v. *J. C. Penny Co.*, 311 *U. S.* 435, 444, quoted *infra*. But *cf.* footnote 35.

violative of due proces of law.[27] In order to determine the validity of this proposition, it is necessary to summarize briefly the relevant facts out of which the controversy before us arose.

*(a)—The facts.*

The indebtedness upon which interest payments were made by Rico Telco to ITT originated in three ways.[28] Apparently the largest amounts were borrowed as a result of the following process: Every year Rico Telco would prepare a budget showing (1) estimated receipts and (2) operating and construction expenditures. *The budget would not take effect unless and until it was approved by ITT, which owned 99.34% of the stock of Rico Telco.* This approval was obtained by means of correspondence originating in Puerto Rico on the part of Rico Telco and in New York on the part of ITT. As a matter of practice, approval of a budget by ITT under which estimated expenditures for a particular year exceeded estimated receipts constituted an agreement that ITT would meet Rico Telco's "deficit",[29] by making loans to it through advances in a current account on which interest was paid by Rico Telco to ITT on the average outstanding balance at the rate of 6%.[30]

---

[27] Prior to the effective date in 1952 of the Constitution of the Commonwealth of Puerto Rico, our statutes were required to meet the test of Federal due process. The same rule holds true today. *Mora* v. *Mejías*, 206 F. 2d 377, 382 (C. A. 1, 1953); *People* v. *Fournier*, 77 P.R.R. 208, 243, footnote 6; *Figueroa* v. *People of Puerto Rico*, 232 F. 2d 615, 619 (C. A. 1, 1956); *A. Roig, Sucrs.* v. *Sugar Board*, 77 P.R.R. 324, 328, footnote 5, affirmed in 235 F. 2d 347 (C. A. 1, 1956), cert. denied, 352 U. S. 928.

[28] The testimony introduced by the appellant does not show the exact amount of the loans for each of the different purposes for which they were made. See footnote 44.

[29] For the most part, such "deficits" were apparently caused by construction activities.

[30] Theoretically, this arrangement should have enabled Rico Telco to pay for its purchases of materials and equipment promptly. However, apparently either because the estimates of expenditures were too low or because of unexpected additional costs, as hereinafter noted, Rico Telco also paid interest on its current account with ISEC whenever the latter made such purchases for Rico Telco in the United States.

Secondly, in addition to the loans arising out of the budgetary estimates, ITT at times made loans to Rico Telco for various business purposes, such as retroactive wages, for which the need developed during the years in question. Here again such loans were requested by letters or cables by Rico Telco to ITT originating in Puerto Rico; they were granted through replies by ITT sent from New York.

A third method occasionally used was for ITT to make cash advances in New York for the account of Rico Telco for such purposes as paying salaries for services being rendered in New York for Rico Telco, travelling expenses to Puerto Rico, and for other business expenses of Rico Telco.[31]

The record or evidence of the above loans—both for principal and interest—took the form of "debit and credit advices" sent by ITT from New York to Rico Telco in Puerto Rico. Payments were made to ITT for these loans and interest by checks drawn by Rico Telco on its account in a New York bank. The funds in that account came from three sources: (1) principally, from deposits by ITT when Rico Telco requested it; (2) funds transferred by Rico Telco from Puerto Rico to New York; (3) loans to Rico Telco by various New York banks.

The interest paid to ISEC arose from the following: Rico Telco made all of its purchases of materials and equipment —other than purchases in Puerto Rico—through ISEC as its purchasing agent. Rico Telco would make payments to ISEC from time to time depending on its financial situation. The indebtedness of Rico Telco to ISEC was carried in an open account on which interest was paid at 6%. The interest charges—as well as the charges for purchases—were recorded in the form of monthly "debit and credit advices" sent by ISEC from New York to Rico Telco in Puerto Rico. Upon receipt of these debit and credit advices, Rico Telco entered

---

[31] In addition, Rico Telco obtained occasional loans from banks in Puerto Rico subject to approval by ITT.

the charges on its books in Puerto Rico. As in the case of payments to ITT, the periodic payments made by Rico Telco to ISEC—both for materials and interest—were made by check on the same New York bank account from which ITT was paid.

(b)—*The case-law.*

The appellant relies, among other cases, on *Domenech* v. *United Porto Rican Sugar Co.*, 62 F. 2d 552 (C. A. 1, 1932), cert. denied, 289 U.S. 739.[32] In that case three Puerto Rican corporations borrowed money from certain Maryland banks and corporations. The loan contracts stipulated ". . . that the principal and interest should be payable in Baltimore; that the money loaned was delivered to the Puerto Rican corporations in Baltimore, and that the payments of interest constituting the income here taxed were made in Baltimore; that none of the Maryland corporations were engaged in business in Puerto Rico, and had no office, place of business, or agent in Puerto Rico; that part of the money thus loaned was used by the borrowers in the United States and part in Puerto Rico . . .". 62 F. 2d at p. 553.

The Court of Appeals held that the Maryland banks and corporations could not be required to pay the Puerto Rican income tax on interest collected from the debtors, the Puerto Rican corporations. The Court said at p. 555: ". . . The question then is whether the Legislature of Puerto Rico had jurisdiction and authority to levy an income tax upon nonresident creditor corporations which had no place of business in Puerto Rico and did no business there through agents or otherwise. The answer to the question is so self-evident that the mere statement of the proposition is its own answer. The Legislature of Puerto Rico is without authority or jurisdiction to impose a tax upon nonresident corporations measured by income earned or to be earned upon transactions entered into

---

[32] To the same effect, *Porto Rico Fertilizer Co.* v. *Sancho*, 98 F. 2d 398 (C. A. 1, 1938).

and wholly performed beyond the confines of Puerto Rico. It has no greater power in this respect than a state."[33]

We cannot agree that the holding and language of the Court of Appeals in the *United Porto Rican Sugar Co.* case automatically answers the problem presented herein. We must decide this case in the light of its peculiar facts. Moreover, we must apply thereto as best we can cases decided by the Supreme Court of the United States after the decision of the *United Porto Rican Sugar Co.* case.

The test in cases of this nature was perhaps stated best in *Wisconsin* v. *J. C. Penny Co., supra,* 444–45: ". . . 'Taxable event,' 'Jurisdiction to tax,' 'business situs,' 'extraterritoriality,' are all compendious ways of implying the impotence of state power because state power has nothing on which to operate. These tags are not instruments of adjudication but statements of result in applying *the sole constitutional test for a case like the present one. That test is* whether property

---

[33] The Court of Appeals held alternatively that the "debt or credit" involved therein (p. 555) ". . . had no situs in Puerto Rico. Its situs was in Maryland, outside the jurisdiction of Puerto Rico . . . . The question of the taxable situs of a debt has been put to rest by the recent decision of the United States Supreme Court in Farmers' Loan & Trust Co. Minnesota, 280 U. S. 204 . . .". This alternative holding no longer seems to have any validity. *State Tax Comm'n* v. *Aldrich, supra;* 1 Freund *et al., Constitutional Law* 567. *Cf. Piacentini* v. *Buscaglia, Treas.,* 59 P.R.R. 764. In any event, whatever the validity of the point as to the situs of the "debt or credit" involved in a loan of money may be in other situations involving other facts and other types of taxes—*cf. John Hancock Mutual Life Insurance Co.* v. *Neill* and *The Union Central Life Insurance Co.* v. *Neill,* ... P. 2d ... (Idaho, February 8, 1957), 25 U.S.L.W. 2390–91, and cases cited; *Sancho* v. *Humacao Shipping Corporation,* 108 F. 2d 157, 159–60 (C. A. 1, 1939); 8 Mertens, *Law of Federal Income Taxation,* § 45.29, p. 295; *State* v. *Gay,* 46 So. 2d 165 (Fla., 1950); Carpenter, *Jurisdiction over Debts for the Purpose of Administration, Garnishment, and Taxation,* 31 Harv. L. Rev. 905, 918–31; Lowndes, *Spurious Conceptions of the Constitutional Law of Taxation,* 47 Harv. L. Rev. 628—we see no purpose in engaging in that kind of dialectical exercise here or in discussing some of our old cases cited by appellant. (For a partial explanation of some of our earlier cases as to taxation of "credits", see *Sucn. Pedro Giusti, Inc.* v. *Tax Court,* 70 P.R.R. 109, 127–31.) It is enough to say that the formula evolved in recent Supreme Court cases dictates the result here. See text of opinion preceding footnote 36.

872

was taken without due process of law, or, if paraphrase we must, *whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return. . . . The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction. . . .*" (Italics ours.)

The Supreme Court has restated this formula in different ways in such cases as *Curry* v. *McCanless,* 307 U. S. 357; *State Tax Comm'n* v. *Aldrich, supra; Harvester Co.* v. *Dept. of Taxation, supra,* 441–44; *Braniff Airways* v. *Nebraska Board,* 347 U. S. 590, 600–01;[34] and *Miller Bros. Co.* v. *Mary-*

---

[31] The *Braniff* case involved the validity of an apportioned ad valorem state tax. No issue as to apportionment is presented here. See *Harvester Co.* v. *Dept. of Taxation, supra,* 442; *Southwestern Gas & Electric Co.* v. *Oklahoma Tax Com'n,* 253 P. 2d 549 (Okla., 1953); Mayoral, *Algunos Comentarios en Torno a Cierto Aspecto de los Sistemas Contributivos Estatales,* XVI Revista del Colegio de Abogados 43; Magill, *Allocation of Income by Corporate Contract,* 44 Harv. L. Rev. 935; Huston, *Allocation of Corporate Net Income for Purposes of Taxation,* 26 Ill. L. Rev. 725; Silverstein, *Problems of Apportionment in Taxation of Multistate Business,* 4 Tax L. Rev. 207; Hellerstein, *State and Local Taxation* 274; Hellerstein, *State Franchise Taxation of Interstate Businesses,* 4 Tax. L. Rev. 95; 1 Freund *et al., Constitutional Law* 645. Nor does the appellant contend that any question as to the commerce clause is involved in this case. Compare *Soltero* v. *Descartes,* 192 F. 2d 755, 759 (C. A. 1, 1951); *Buscaglia* v. *Ballester,* 162 F. 2d 805, 806 (C. A. 1, 1947), cert. denied, 332 U. S. 816; *Porto Rico Telephone Co.* v. *Tax Court,* 68 P.R.R. 144, 151, with *Mora* v. *Mejías, supra,* p. 387, footnote 6.

We are concerned here only with the due process clause. A tax may meet due process objections even though it might not be valid under the commerce clause. Mr. Justice Rutledge pointed this out in his concurring opinion in *Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340 at 353: " 'Due process' and 'commerce clause' conceptions are not always sharply separable in dealing with these problems. *Cf. e. g., Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1. To some extent they overlap. If there is a want of due process to sustain the tax, by that fact alone any burden the tax imposes on the commerce among the states becomes 'undue'. But, though overlapping, the two conceptions are not identical. *There may be more than sufficient factual connections, with economic and legal effects, between the transaction and the taxing state to sustain the tax as against due process objections. Yet it may fall because of its burdening effect upon the*

*land,* 347 U. S. 340.[35] These cases involve facts and types of taxes which differ to some extent from the facts and tax involved herein. But they are important for our purposes in that they furnish guidance in the search for the outer limits

---

*commerce.* And, although the two notions cannot always be separated, clarity of consideration and of decision would be promoted if the two issues are approached, where they are presented, at least tentatively as if they were separate and distinct, not intermingled ones." (Italics ours.) In the *Braniff* case, although Mr. Justice Frankfurter dissented because in his view the tax offended the commerce clause, he conceded that it did not violate the due process clause. 347 U. S. at 608–09. See *Ballester Hermanos* v. *Tax Court,* 66 P.R.R. 531, 536, footnote 3, reversed on other grounds in 162 F. 2d 805 (C. A. 1, 1947), cert. denied, 332 U. S. 816.

In examining the argument that a tax statute is violative of due process, we must bear in mind that the taxpayer has ". . . the burden . . . to negative every conceivable basis which might support it." *South Porto Rico Sugar Co.* v. *Buscaglia, supra,* 100; *Rivera* v. *Buscaglia,* 146 F. 2d 461, 465 (C. A. 1, 1944) ; *Buscaglia, Treasurer* v. *Tax Court; Pérez Vahamonde,* 68 P.R.R. 322, 337, approved in *Buscaglia* v. *Ahumada,* 171 F. 2d 775 (C. A. 1, 1949) ; *Postley* v. *Secretary of the Treasury, supra,* 830–31. (While these cases involved contentions of discriminatory taxation rather than "jurisdiction to tax", we think the same burden applies in the latter situation.)

[35] The *Miller* case reverts to the phrase "jurisdiction to tax". *Cf.* footnote 26. But the *Miller* case does not represent a departure from the concepts (1) that state taxation is not limited by territorial boundaries *per se* and (2) that there must be, however, some connection between the State and the object of the tax. On the first point, the Court adhered to expressions in its previous cases when it indicated that (pp. 342–43) ". . . visible territorial boundaries do not always establish the limits of a state's taxing power or jurisdiction. . . . If there is some jurisdictional fact or event to serve as a conductor, the reach of the state's taxing power may be carried to objects of taxation beyond its borders. When it has the taxpayer within its power or jurisdiction, it may sometimes, through him, reach his extraterritorial income or transactions. *On the other hand, if it has jurisdiction of his* taxable property or *transactions, it may sometimes, through these, reach the nonresident.*" (Italics ours.) As to the second point, it said at pp. 344–45: ". . . due process requires some definite link, *some minimum connection,* between a state and the person, property or transaction it seeks to tax." (Italics ours.)

By a 5–4 vote, the Court held that *under the facts involved in the Miller case,* it violated due process for Maryland to require a Delaware merchant to pay a use tax—collected by seizing his truck when it was driven into Maryland—for sales made of merchandise in Delaware to Maryland residents. So far as we are aware, the *Miller* case is the only instance in which the Supreme Court has invalidated a use tax on grounds of due process. *The Supreme Court, 1953 Term,* 68 Harv. L. Rev. 96, 130;

of the boundaries of State taxation in a particular case so far as due process is concerned.[36]

(c)—*Application of the Supreme Court cases to the facts herein.*

When the Court of Appeals decided the *United Porto Rican Sugar Co.* case in 1932, it did not have the benefit of the later Supreme Court cases emphasizing in the context of the facts of those cases the rule that the states may levy a tax if it is related to ". . . protection, opportunities and benefits given by the state." 311 U. S. at 444. We recognize, however, that even under the latter rule the Court of Appeals might conceivably have held *under the facts in the United Porto Rican Sugar Co. case* that "the minimal connections" between

---

XXIX Tulane L. Rev. 356; 8 Vand. L. Rev. 124; 53 Mich. L. Rev. 133. It is interesting to note that three of the five justices who joined in the majority opinion in 1954—Reed, Jackson, and Minton—are no longer members of the Court, whereas the four dissenting Justices—Warren, Black, Douglas, and Clark—are all still on the Court. However, it would be futile for us to speculate on whether the Supreme Court as presently composed would adhere to the result reached in the *Miller* case. For our purposes, it suffices to say that we find nothing in its result—and certainly nothing in its language—which departs from the rule laid down by the Supreme Court in the other cases cited in the body of the opinion. See *Topps Garment Manufacturing Corporation* v. *State*, 128 A. 2d 595 (Md., 1957).

[36] Wood, *Due Process of Law, 1932–49*, Chapter V, p. 341 *et seq.*, contains an excellent discussion of the Supreme Court cases in this field decided during the indicated period. And see Freund *et al.*, *Constitutional Law* 566; Hellerstein, *State and Local Taxation*, 468 *et seq.*; Hartman, *State Taxation of Interstate Commerce*, pp. 46, 80 *et seq.*

For a recent State case discussing this problem in detail and citing other State cases, see *John Hancock Mutual Life Insurance Co.* v. *Neill* and *The Union Central Life Insurance Co.* v. *Neill, supra.* We are advised that a petition for rehearing is pending in this case.

As in many due process cases, the formula evolved by the Supreme Court is one of degree. *Porto Rico Telephone Co.* v. *Tax Court, supra,* 159. Accordingly, there are cases which fall on either side of the line. Each case must therefore be decided on its own facts. At times it is difficult to determine into which category a particular case fits; indeed, the Justices of the Supreme Court are rarely unanimous on this question. But as presently noted, we think the result required by the facts of this case under the said formula is clear.

Puerto Rico and the transactions in question as required by the due process clause did not exist. That is to say, if as in the *United Porto Rican Sugar Co.* case (1) an independent corporation doing business in Puerto Rico dealing at arm's length borrowed money on its own initiative in New York (2) from a New York corporation which does no business and has no ties whatsoever here, (3) with no note or other evidence of the indebtedness located in Puerto Rico, and (4) with the interest and principal of the loan paid by the debtor to the creditor in New York, a substantial question would arise as to whether there was any connection between Puerto Rico and such a transaction under which some protection, opportunity or benefit had been conferred by Puerto Rico which would meet due process objections to the imposition of the Puerto Rican income tax on the creditor for the interest paid to it by the debtor. But we need not answer that question here because the facts of this case are clearly distinguishable.

This is not a case where a Puerto Rican corporation on its own initiative obtained a loan in New York at arm's length from a wholly unrelated corporation which has no ties with Puerto Rico. First, ITT, the ultimate taxpayer here, owns 99.84% of the stock of Rico Telco, the debtor. Second, as shown by Exhibit A and other evidence in the record, ITT has a management contract with Rico Telco under which its fees are apparently a specific percentage of the receipts of Rico Telco. Third, and perhaps most important, the annual budget of Rico Telco—including the borrowing of money on which the largest portion of the interest herein was to be paid—could not become effective until ITT approved it. The net effect of this budget arrangement was that ITT, the creditor—and not Rico Telco, the debtor—made the decision whether the debtor should make any effort to obtain a loan, the proceeds of which were to be used almost entirely in

Puerto Rico.[37] Fourth, since a large part of the money borrowed was to be used for construction and maintenance, approval of the budgets and loans meant not only that ITT would receive interest from Rico Telco on such loans, but also that ITT would benefit by the business ISEC, its wholly-owned subsidiary corporation, would receive as purchasing agent for the materials and equipment bought in the United States with the borrowed money.[38] Fifth, although not couched in the language of a promissory note executed by the debtor, the debit and credit advices sent by ITT to Rico Telco as evidence of the loans—together with the letters and cables requesting and acknowledging receipt of such loans and the books of account of Rico Telco reflecting these loans and interest—might well be considered in the light of all the circumstances, for all practical and legal purposes, as tangible and concrete evidence of the indebtedness physically located in Puerto Rico.[39]

The foregoing represent in our judgment a sufficient array of contacts and ties between the transactions resulting in the payment of interest to ITT and Puerto Rico to justify the exaction by the Commonwealth of an income tax on such interest so far as due process is concerned. There are various details in the record which illustrate how the concatenation

---

[37] We realize that even when the parties deal at arm's length, the final decision as to the making of a loan rests with the potential creditor. But here there was something more. Rico Telco, a subsidiary corporation, could not even make the decision to seek a loan—no matter who the creditor might be—without the specific approval of its parent corporation, in view of the requirement that Rico Telco's annual budget was subject to approval by ITT.

[38] This point is also relevant as to the tax on interest paid to ISEC, discussed hereinafter. While the record is silent as to the charges made by ISEC to Rico Telco for acting as its purchasing agent, we think it is fair to infer that this service was not rendered gratis. Certainly this is not negatived in the record.

[39] In the concluding paragraph of its brief appellant prays that we hold that Puerto Rico is precluded from imposing the tax herein ". . . unless there are within Puerto Rico tangible and concrete evidence of such indebtedness such as bonds or promissory notes or bank deposits requiring the sanction and protection of the laws of Puerto Rico to permit their transfer."

of circumstances in this case meets any due process of law objections based on an alleged lack of connection between Puerto Rico and the interest herein. For example, an interchange of letters between Rico Telco and ITT shows graphically that ITT was dictating steps which had a substantial impact *in Puerto Rico* on the business of Rico Telco and on the earning by ITT of the interest by virtue of events in Puerto Rico. On October 20, 1944 the Comptroller of Rico Telco wrote the Vice President and Comptroller of ITT in part that "The Banco de Ponce have indicated that they are ready and willing to let us have funds on demand notes at no more than $3\frac{7}{8}\%$ interest whenever we require such financing. . . . Our September review of the 1944 Budget provided for $100,000 remittance from I.T.T. to us before the end of 1944, and the 1945 Budget provides for another $100,000 at the beginning of 1945. The economies we would realize from the lower interest rate and the saving of taxes because of the disallowance of interest paid to parent Company, roughly $5,000, for both, have not been reflected in the budget."

The Vice President and Comptroller of ITT replied on October 27, 1944 as follows: "We have given considerable thought to the matter of borrowing funds in Puerto Rico, as outlined in your letter of October 20th. This is only temporary financing and from an I.T.T. System point of view it is very minor. Such financing would only temporarily reduce the amount of advances from ITT and from a System viewpoint would increase the overall interest charges as we have excess funds in New York bearing little or no interest. Therefore, we see no good reason for borrowing these short-term funds locally. Instead, we should be looking forward to additional long-term financing if and when, after the conversion of the automatic exchange at San Juan and Santurce, the earnings will support such loans."

We thus see from these letters, introduced in evidence by the appellant itself, that Rico Telco wished to borrow money locally in order (1) to pay a lower rate of interest and (2)

to deduct such interest payments as expenses in calculating its own income tax.[40] ITT refused to permit this. Instead, as the parent corporation ITT ordered Rico Telco to forego in Puerto Rico these obvious and substantial financial advantages "from an I.T.T. System point of view." We do not hold that these letters necessarily indicate improper conduct on the part of ITT. We call attention to them as reinforcing our thesis that the combination of the foregoing five factors in this case shows that ITT was not an ordinary creditor, with no ties or transactions in Puerto Rico, which made an arm's length loan to a debtor in New York, receiving the interest thereon in New York. Rather these letters drive home the point that under the peculiar circumstances of this case the interest involved herein arose out of transactions which tie in with sufficient contacts by ITT with Puerto Rico to warrant the conclusion that there can be no due process objection to the imposition of income taxes by Puerto Rico on the said interest.

We think it is also worth noting that since 1940 Rico Telco has voluntarily withheld the income tax payable by ITT on the management fees Rico Telco pays to ITT. See Exhibit A.. There is nothing in the record disclosing the nature of the services rendered by ITT to Rico Telco for these management fees nor the place or places where they are performed. However, it is difficult to visualize how such services could be performed without any contacts whatsoever—either by services rendered by ITT personnel or otherwise—by ITT with Puerto Rico. Certainly—in view of the fact that Rico Telco withheld and paid on behalf of ITT our income tax on the management fees for such services—both Rico Telco and ITT

---

[40] Section 32 (a) (2) of the Income Tax Act was amended by Act No. 31, Laws of Puerto Rico, 1941, to provide that interest shall not be deductible in computing the net income of a corporation "when payable . . . between two corporations when one of them owns or controls more than fifty (50) per cent of the outstanding stock of the other corporation." See *Buscaglia, Treas.* v. *Tax Court; Rullán*, 67 P.R.R. 548, affirmed in 168 F. 2d 401 (C. A. 1, 1948) ; *Community of the Heirs of Fajardo* v. *Tax Court*, 73 P.R.R. 499, 504–08.

have acquiesced in the view that the services rendered by ITT resulted in sufficient ties with Puerto Rico to make ITT subject to income tax on the fees therefor so far as due process is concerned. Whether a management fee may be paid by a public utility operating in Puerto Rico to its parent corporation primarily is a question to be determined in the first instance in an appropriate proceeding by the Public Service Commission, and not by the courts in a tax case. See *P.R. Ry., Lt. & P. Co.* v. *Buscaglia, Treas.*, 62 P.R.R. 572, 582–87. But we think it is fair to conclude from the very existence of such a management contract, the payment of fees thereunder by Rico Telco to ITT, the voluntary payment of our income tax on behalf of ITT on such fees, and the other circumstances of this case, that the revenues accruing to ITT—including the interest involved herein—arose out of contacts with Puerto Rico for which the Commonwealth furnished the "protection, opportunities and benefits" which justified the tax herein as a matter of due process.[41]

Finally, in appraising the nature of the contacts of ITT with Puerto Rico, it is pertinent to point out that the appellant concedes that since 1941 Rico Telco has validly withheld and paid to the Secretary of the Treasury the income tax imposed on the dividends paid to ITT by Rico Telco. Indeed, the individual nonresident stockholders involved in the *Postley* case did not challenge on due process grounds the power of Puerto Rico to impose a tax on dividends paid

---

[41] It may be conceded that the details of its operations in Puerto Rico were executed by Rico Telco. But we think that under all the circumstances—certainly as to the loans herein, made largely for construction purposes and requiring ITT's specific approval in the annual budgets—overall policy for Rico Telco was controlled by ITT. In coming to this conclusion, we do not undertake to say that ITT was doing business in Puerto Rico in the sense in which that phrase is used in other contexts. *Cf. Internat. Shoe Co.* v. *Washington*, 326 U. S. 310; *Elliot & Sons Co.* v. *Nuodex Products Co.*, 243 F.2d 116 (C. A. 1, March 26, 1957); *People* v. *South Porto Rico Sugar Co.*, 56 P.R.R. 633. Our holding on this phase of the case is confined to the "jurisdiction to tax" point based on the due process clause raised by the appellant.

to them on their shares of stock in corporations doing business in Puerto Rico. *Postley* v. *Secretary of the Treasury, supra.*[42] There is perhaps more justification from the constitutional point of view for taxation of such dividends as compared with taxation of interest paid to nonresident individuals or corporations. *Cf. John Hancock Mutual Life Insurance Co.* v. *Neill* and *The Union Central Life Insurance Co.* v. *Neill, supra,* and cases cited therein. But it is not amiss to indicate that these dividends may be traced at least in part to the intervention by ITT in the management and policy decisions of Rico Telco. The latter's budgets, as approved by ITT, contained construction programs which undoubtedly contributed toward the earning of the dividends. Such construction was made possible by the loans for which the interest was paid to ITT. Once more we find ties and links between Puerto Rico and the earning of the said interest sufficient to meet the constitutional objections advanced by the appellant against the imposition of our income tax on the said interest.[43]

We think the same reasoning may be applied to the other loans which ITT made to Rico Telco (1) in addition to the budgetary requirements, for various business purposes and (2) as cash advances in New York for salaries and other business expenses for the account of Rico Telco. All the loans were a part of the pattern which ITT used to control and aid Rico Telco in the management and conduct of the latter's business as a public utility operating exclusively in

---

[42] In the *Postley* case nonresident individual stockholders successfully attacked under the privileges and immunities clause the *discriminatory* rates of income taxation to which such dividends were subjected; they were required to pay our income tax thereon at the same rate at which residents were taxed. 75 P.R.R. at 845.

[43] We also note that if Rico Telco paid dividends to its parent corporation, such payments were not deductible in calculating the income tax imposed by our Income Tax Act on Rico Telco; on the other hand, interest payments by Rico Telco to ITT were deductible until this was prohibited by Act No. 31 of 1941, which was retroactive to January 1, 1940. See footnote 40.

Puerto Rico. Moreover, even if the loans in these two latter categories were sufficiently different from the loans resulting from the budget estimates to warrant a different conclusion, the appellant had the burden of showing the exact amount of such loans in order to prevail in a suit to disallow deficiencies for income taxes imposed on the interest thereon. See *Misbourne Pictures Limited* v. *Johnson*, 189 F. 2d 774, 776 (C.A. 2, 1951). The appellant made no effort at the trial to show the exact amount of the loans by ITT to Rico Telco in each of the three categories.[44] We are therefore not in a position to treat differently the interest on the various kinds of loans made by ITT to Rico Telco even if we were disposed to take that action.

We see no reason for treating the interest payments to ISEC differently. As in the case of ITT, we do not reach the question which would be presented if ISEC were an independent purchasing agent dealing at arm's length with Rico Telco and charging it 6% on an open account. Here ITT, owning 99.84% of the stock of Rico Telco, also owned all the stock of ISEC. As we have seen, the budget which ITT finally approved produced the purchases by ISEC which in turn resulted in the interest herein. Also, once more the evidence of the indebtedness—the debit and credit advices —were sent from New York and were located in Puerto Rico. For substantially the same reasons already set forth as to interest paid to ITT, we find no valid due process objection to the income taxes imposed on the interest paid by Rico Telco to ISEC.[45]

In view of the result we have reached, we need not determine whether the power of Puerto Rico to impose income taxes is tested by the constitutional limitations which apply to a State of the Union, or whether its power in this field,

---

[44] See footnote 28.

[45] *Cf. Rojo vda. de Goicochea* v. *Tax Court*, decided by a Per Curiam opinion on March 3, 1954; *González* v. *Secretary of the Treasury*, 75 P.R.R. 864.

at least with reference to due process considerations based on "jurisdiction to tax", is analogous to that of Congress. *Cf. Rivera v. Buscaglia, supra; Domenech v. Havemeyer,* 49 F.2d 849 (C.A. 1, 1931); *Postley v. Secretary of the Treasury, supra,* pp. 840, footnote 12, 843; *Ballester v. Court of Tax Appeals, supra,* 492; *West India Oil Co. v. Domenech,* 311 U.S. 20; *Buscaglia v. Ballester, supra; Irizarry v. District Court,* 64 P.R.R. 90, 101; *Domenech v. National City Bank,* 294 U.S. 199; *Domenech v. United Porto Rican Sugar Co., supra; Cook v. Tait,* 265 U.S. 47; *Burnet v. Brooks,* 288 U.S. 378; *Roig Commercial Bank v. Treas. of P. R.,* 74 P.R.R. 919; *A. C. Monk & Co. v. Com'r of Int. Rev.,* 10 T.C. 77; *Motty Eitingon v. Com'r of Int. Rev.,* 27 B.T.A. 1341; 8 Mertens, *supra,* p. 295; *South Porto Rico Sugar Co. v. Com'r of Int. Rev.* 2 T.C. 738; *Annotations,* 12 A.L.R. 2d 360, 156 A.L.R. 1370; Angell, *The Non-Resident Alien: A Problem in Federal Taxation of Income,* XXXVI Col.L.Rev. 908; Rudick and Allen, *Tax Aspects of Operations under the Puerto Rican Exemption Program,* 7 Tax L.Rev. 403, 425; Note, *Taxation of Income from Foreign Sources,* 68 Harv.L.Rev. 1036.[46]

## III

Section 58(a) of the Income Tax Act provides for a 5% penalty "if any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud . . .". The trial court, without giving any reasons therefor, upheld the imposition of 5% penalties, amounting to $2,272.54, because the appellant

---

[46] In *Treichler v. Wisconsin,* 338 U. S. 251, the Court pointed out at pp. 256–57: "A state is not equipped with the implements of power and diplomacy without its boundaries which are at the root of the Federal Government's undoubted right to measure its tax upon foreign property. *United States v. Bennett,* 232 U. S. 299 (1914); see *Burnet v. Brooks,* 288 U. S. 378 (1933). And if the state has afforded nothing for which it can ask return, its taxing statute offends against that due process of law it is our duty to enforce." The Court added in footnote 4 at p. 257: "Of course we have refused to be governed by this consideration when so to do would have placed a premium upon the avoidance of all state taxes."

failed to withhold the taxes owed by ITT and ISEC on the dividends and interest paid to them by Rico Telco during the years in question.

We agree that these penalties should not have been imposed in this case. As for the penalty for failure to withhold the tax on the 1940 dividends, this Court as already noted held in *Central Aguirre* v. *Tax Court, supra,* that an entity in the same situation as the appellant was not required to withhold the said tax. It is true that the *Central Aguirre* case had not yet been decided when the appellant was faced with this problem, and that in Part I we have overruled that portion of the *Central Aguirre* case. But in 1940–41 this was a new and complicated problem; indeed, this is demonstrated by the fact that this Court erred in the *Central Aguirre* case in attempting to solve it. In substantially the same way, Rico Telco felt justified by the *United Porto Rican Sugar Co.* case in not withholding the tax on the interest, and a number of the Supreme Court cases on which we have relied in Part II were decided after Rico Telco made the returns in question. For these reasons, we cannot agree that the deficiency in this case was ". . . due to negligence, or intentional disregard of rules and regulations . . .". 10 Mertens, *supra* § 55.25, pp. 50–55; Hoffman, *Intentional Disregard of Rules and Regulations,* 28 Taxes 111; *Lilly* v. *Com'r of Int. Rev.,* 14 T.C. 1066, 1086–87; *Heffelfinger* v. *Com'r of Int. Rev.,* 32 B.T.A. 1232; see *Spies* v. *United States,* 317 U.S. 492, 496–97.[47] The then Treasurer was not justified in imposing the 5% penalties herein.

The judgment of the Superior Court will be modified to eliminate the 5% penalties. As thus modified, the judgment will be affirmed.

---

[47] *Fides, A. G.* v. *Commissioner of Internal Revenue,* 137 F. 2d 731, 735 (C. A. 4, 1943), cert. denied, 320 U. S. 797, the only case cited by the Secretary of the Treasury, is distinguishable. There the question of the failure to file a return in time was involved. And see *Community of the Heirs of Fajardo* v. *Tax Court, supra,* pp. 502–04.

Mr. Justice Marrero, although absent at the time of signing the judgment in the case, was present at the hearing and during the discussion thereof, and agrees with the opinion and judgment rendered in the case.

Mr. Justice Sifre and Mr. Justice Belaval did not participate herein.